CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
OCT 11 2006 for C'ville
JOHN F. CORCORAN, CLERK
BY: /s/ J. Walker
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>HASSAN J. MILLER,<br><br>                              *Defendant.* | CASE NO. 3:06-CR-50025<br><br>OPINION AND ORDER<br><br>JUDGE NORMAN K. MOON |

      This matter is before the Court on Defendant Miller's August 5, 2006 Motion to Suppress and Exclude Evidence. For the reasons set forth below, this motion will be denied.

### I. Facts and Procedural History

      This case arose out of a traffic stop on Friday, May 26, 2006. On that day at about 7:44 PM, Virginia State Trooper N. R. White stopped an Acura Integra driven by Defendant Miller, suspecting excessive window tint. The car had Connecticut license plates and was registered to a woman's name, although both Defendant Miller and his passenger were men. Trooper White measured the window tint and found it to be darker than permitted by Virginia law, allowing only 23% of light to pass rather than 50%. He also requested the driver's licenses of both the driver and the passenger, one Kwane Kareem Walker. These were issued by the state of New York.

      Trooper White noted that the driver's heart was pounding so hard that his chest was visibly pulsing through his shirt. In addition, his carotid artery was visibly pulsing. Trooper White testified that he has been in the uniformed patrol division for 3 years and has made a large

number of traffic stops in that time period. According to Trooper White, while it is common for stopped drivers to be nervous, he had only witnessed this extreme level of physiological excitement by a driver on one other occasion, in which the driver was found to have been smuggling crack cocaine.

Upon questioning in Trooper White's cruiser, Defendant Miller explained the mismatch between a New York license and a Connecticut registration to a woman by saying that he was driving his sister's car. A computer check did not turn up any reports that this car had been stolen, nor did it reveal any outstanding warrants on Defendant Miller. When questioned about his travel plans, Defendant Miller said that he and Mr. Walker were going to "Bike Week" in Myrtle Beach, South Carolina. He explained the choice of U.S. 29 (which passes through neither New York nor Myrtle Beach) by saying they would spend the night with a friend in Charlottesville before going to the beach. Trooper White testified that Defendant Miller was "very agitated" and hesitant to answer questions.

The computer check revealed that Mr. Walker's driving privileges in Virginia had been suspended for failure to pay fines. After speaking with Defendant Miller, Trooper White left Defendant Miller in his cruiser and walked back to the Acura to explain this. Mr. Walker gave a different account of their travel plans: he said they expected to visit his daughter in Charlottesville and remain there for the entire Memorial Day weekend. He later gave directions to his daughter's residence which were consistent with the address he gave at the hearing. Mr. Walker denies this version of events, saying that he gave the same account as Defendant Miller. Unfortunately, the video recorder in the cruiser had ceased operating at some point so that none of these events was captured on tape. At some point Trooper White's attention was directed to the camera, when noticed it was not operating and turned it back on.

Sometime after 7:53 PM (which was the time of the radio call indicating that Mr. Walker's license was suspended), Special Agent Herrman of the Virginia State Police stopped to assist Trooper White. This is the regular practice of law enforcement officers when they become aware of a fellow officer who is outnumbered while making a traffic stop. Investigator Shifflet of the Orange County Sheriff's office also stopped after receiving a call from Special Agent Herrman.

After telling Mr. Walker about his suspended privileges but before completing formal notification, Trooper White permitted both Miller and Walker to return to the car. He then spoke with Mr. Miller again and asked him about the differing stories in an effort to clear up what appeared to be a suspicious situation. Mr. Miller tried to explain the discrepancy away but did not satisfy Trooper White's concern. Trooper White and Special Agent Herrman decided to call for a drug-detecting dog. After making a number of calls to locate the nearest dog, they found Officer Holly Hill and Seltic, both of the Culpeper police department.

While waiting for the drug dog, Trooper White filled out formal paperwork, known as a DSA-10, notifying Mr. Walker that he was not permitted to drive in Virginia. According to Trooper White, this is the regular practice of police who encounter citizens with suspended licenses, and he had the appropriate forms with him in the cruiser. Mr. Walker began making phone calls to find out how to pay his fines and get his privileges restored. He repeatedly asked Trooper White for assistance in discovering how much he owed and to whom it should be paid. Confronted with the differing stories during one of his phone calls, Mr. Walker claimed he had been misunderstood by the Trooper the first time.

At 8:27, approximately 10 minutes after the DSA-10 was turned over to Mr. Walker, and while Mr. Walker was still on his cell phone seeking information, Officer Hill arrived with Seltic

and proceeded to perform a walk-around. The dog "alerted" on the car, indicating the presence of narcotics. According to Officer Hill, who has been a K-9 officer since 2003, a dog "alerts" by sitting or laying down, placing his nose in the area where he detects the scent, and taking a deep sniff. At the time of the alert, about 45 minutes had passed from the initial stop. Once Seltic had told Officer Hill that the car contained contraband, Special Agent Herrman and Trooper White searched it. They first searched the passenger compartment, finding nothing illegal. They then opened the trunk, which caused Seltic to become excited and drag Officer Hill back over to the car.

Two red suitcases were found in the trunk, which were then placed in front of the car, separated from each other, for Seltic to examine. He "alerted" on one of them. This suitcase was ultimately found to contain a large quantity of heroin. Defendant Miller claimed that suitcase at the scene, denying that Mr. Walker was involved. After arrest and a Miranda warning, he confessed that he had been paid $1,000 by a someone to transport the drugs from New York to Charlottesville. He has never identified this person. Mr. Walker denied any knowledge of the heroin.

Trooper White never issued a summons for the window tint.

On August 5, 2006, Defendant Miller moved to exclude the heroin and subsequent confession from evidence on the grounds that its seizure violated the 4th Amendment. After briefing, argument was held on September 25, 2006.

## II. Standard of Review: Fourth Amendment Standards at Traffic Stops

Traffic stops are regulated by *Terry v. Ohio*[1] and its progeny. When an officer reasonably suspects that a crime has been or is being committed, based on "articulable facts," the officer

---

[1] 390 U.S. 1 (1968)

may briefly detain the suspect and even conduct a brief search to ensure officer safety. *Id* at 30. The archetypical traffic stop, when an officer has witnessed a traffic violation, easily meets this standard and is properly analyzed under *Terry*. *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992). During a traffic stop, a police officer may required both the driver and passengers to exit the vehicle as a matter of course. *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (driver); *Maryland v. Wilson*, 519 U.S. 408 (1997) (passengers).

Once the purpose of the *Terry* stop has been accomplished, the officer may not detain the suspect any longer. A stop must be both "justified at its inception," and "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 390 U.S. at 20; *See also Rusher*, 966 F.2d at 875 ("If...the officers exceeded the stop's proper scope, the seized contraband is excluded..."). In the context of a traffic stop, the officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation," but no more "unless the officer has a reasonable suspicion of a serious crime.". *Id.* at 876-77. This standard bars even very brief detentions when they are not justified by reasonable suspicion.

On the other hand, when reasonable suspicion is present, a 38-minute detention while awaiting the arrival of a drug dog has been ruled reasonable by the Fourth Circuit. *See United States v. McFarley*, 991 F.2d 868 (4th Cir. 1998). The Supreme Court described a 90-minute wait as "unreasonable," at least where officers knew of a particular suspect's arrival and had the ability to arrange for a dog to be present in advance. *United States v. Place*, 462 U.S. 696 (1983). While there is nothing magical about that particular time frame, it can be inferred that, in a chance encounter, reasonable suspicion will justify much shorter detentions while waiting for the arrival of a trained dog.

Reasonable suspicion requires a "particularized and objective basis for suspecting legal

wrongdoing," based on the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Facts which are innocent in isolation may combine to justify an investigative detention. *Id.* at 274-275, *see also United States v. Sokolow*, 490 U.S. 1, 9 (1989). Substantial deference is afforded to the officer's experience and training, which allows him to see things that the laymen might miss. *United States v. Cortez*, 449 U.S. 411, 419 (1981).

There is no constitutional difficulty with subjecting a car or bag to a sniff by a drug-detecting dog. *Place*, 462 U.S. at 706-07. There is no reasonable expectation of privacy in the air surrounding or escaping from one's possessions, such that a sniff by a dog is not a "search." *Id.* When a properly-trained dog "alerts" to the presence of drugs, probable cause is provided by the dog to conduct a search. *McFarley*, 991 F.2d at 1193.

Usually, a warrant is required to justify a search, even where probable cause is as obvious as a dead police officer in the room. *Mincey v. Arizona*, 437 U.S. 385, 395 (1978). However, when probable cause exists, no warrant is required to search an automobile. *Maryland v. Dyson*, 527 U.S. 465 (1999). Similarly, closed containers within automobiles may be opened without a warrant as long as probable cause to search the car exists. *United States v. Ross*, 456 U.S. 798, 820-821 (1982).

### III. Discussion

The time period properly in dispute is very limited. There is no question, or any controversy, that Trooper White's observation of heavily tinted windows justified the initial stop of the Acura driven by Defendant Miller. His check of the window's degree of tint, which showed that his initial suspicion was correct, was similarly justified. He had every right to examine Mr. Miller's identification, check for outstanding warrants, and receive an explanation of the third-party registration. After the drug dog arrived about 45 minutes after the initial stop

and indicated the presence of contraband within the vehicle, probable cause for a detention and search existed. Therefore, the only issue is the propriety of the detention between a time when Trooper White might have issued a warning or summons for dark windows and the arrival of the dog. If reasonable suspicion existed, then detention for a limited time was justified and the evidence will not be suppressed. If not, then even a very short detention would require the suppression of evidence.

### A. Examination of Mr. Walker's identification.

A significant part of the time between the initial stop and the arrival of the dog was consumed by the need to fill out paperwork to formally notify Mr. Walker of his outstanding fines. In addition, the suspension of his driving privileges was also the reason that Trooper White had occasion to ask Mr. Walker about the pair's travel plans, which in turn led to the discovery of their disparate stories. At the hearing, defense counsel argued that requesting identification from passengers as well as the driver was unconventional, and hinted at a racial motivation by Trooper White. No evidence was presented by either side on the frequency with which passenger ID is requested by police officers making traffic stops.

This Court cannot find it unreasonable to request the identification of passengers at traffic stops. Although police have a limited ability to *require* that anyone show identification on pain of arrest (*see Kolender v. Lawson*, 461 U.S. 352 (1983)), they have every right to ask for voluntary cooperation and the voluntary production of ID from virtually everyone they happen to encounter. *See, e.g Florida v. Royer*, 460 U.S. 491, 497-98 (1983); *INS v. Delgado*, 466 U.S. 210 (1984). There is also a substantial state interest in highway safety, which justifies ensuring that even those currently only passengers are properly allowed to drive, in the event that they are asked to relieve the driver. This is even more true when, as in this case, the car appears to be

making a long road trip. In this case, it turned out that Mr. Walker was *not* allowed to drive in Virginia, a fact of which he claimed to be unaware.

Similarly, it is entirely reasonable to formally notify a passenger of his suspended status. This is part of the community caretaking function which police must fulfill as part of their duties. *See Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). Mr. Walker, had he been caught driving in Virginia, could have been arrested, and it was in his interest to avoid that outcome. Indeed, he spent much of his time by the side of the road seeking to resolve the problem. Furthermore, the formal notice would have helped him in paying his outstanding fines, serving the interests of both the Commonwealth of Virginia in collection of fines and of Mr. Walker, who could avoid further interest, penalties, and possible arrest as a scofflaw thereby. Although Defendant Miller objected the preparation of the DSA-10 for Mr. Walker at the hearing, "there was no showing that [Trooper White], who [was] following standardized procedures, acted in bad faith or for the sole purpose of investigation." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987). Nor was the time required to complete it excessive; Trooper White's radio record shows that he was notified of Mr. Walker's suspended status by radio at 7:53 and, based on the video of the stop, took approximately 20-25 minutes to finish it, including conversations with both parties. The additional detention necessary to prepare the paperwork was reasonable even without any suspicion and did not violate the Fourth Amendment.

### B. Reasonable Suspicion.

There now remain approximately 10 minutes unaccounted for, between the completion of the DSA-10 and the arrival of the drug dog at 8:27 PM. If reasonable suspicion existed, then this short detention (at a time when Mr. Walker was using his cell phone in an attempt to clear up questions about his outstanding fines) could not possibly cause constitutional problems. If,

however, there was no reasonable suspicion, than even this short delay would be "unreasonable" under *Rusher* and the heroin would have to be suppressed.

The facts cited by Trooper White in his report were:

1. Extreme physiological reaction to the traffic stop, outside the range of Trooper White's experience and consistent with a prior drug-smuggling arrest,

2. Odd choice of route to Myrtle Beach

3. Inconsistent stories as to travel plans

4. No plans or reservations for accommodations upon arrival at Bike Week, which Trooper White described on the video as risky, given the likelihood of large crowds.

Additionally, Trooper White testified that in his experience, New York City is a common "source city" for drugs, and both parties provided him with licenses showing addresses in or near New York.[2]

Defendant Miller would eliminate #1 and #3, claiming that it is normal to be nervous during a traffic stop, and also that Mr. Walker's testimony at the hearing contradicts the Trooper's testimony and report. He would also claim that #2 is easily explained by the need to visit Mr. Walker's daughter, although he mentioned only a "friend" when initially questioned. Finally, Defendant Miller makes much of the fact that New York was not mentioned in Trooper White's report, other than in the boxes for the arrestees' residences.

Such a piecemeal analysis is inconsistent with the "totality of the circumstances" test of *Arvizu*. In reversing a decision of the Ninth Circuit which had examined each of the officer's observations in isolation and found them innocent, the Supreme Court wrote "*Terry*, however,

---

[2]Mr. Walker's address in the Bronx, while Defendant Miller's is in Mt. Vernon, located in Westchester county and touching the border with New York City.

precludes this sort of divide-and-conquer analysis." *Arvizu*, 534 U.S. at 275. Instead, a reviewing court must consider all factors together, while giving due weight to an officer's specialized training and experience. "[T]he evidence...must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement," who are capable of "inferences and deductions that might well elude an untrained person." *Cortez*, 449 U.S. at 418.

Normally, as more questions are asked of innocent persons, suspicions will fade. Here, each answer brought new questions, the answers to which only seemed more suspicious. Viewed from the perspective of an experienced officer, two New Yorkers, driving a car with Connecticut plates and registered to neither of them, on their way to two different destinations, one of which is nowhere near their current route, and apparently lacking any notion of where they intend to spend the night upon their predicted arrival at an enormous event, are indeed suspicious. Their windows were also tinted to less than half the transmittance required by Virginia law, which from a police officer's perspective serves to conceal the interior of the car from view. However innocent any single factor can be made to appear, in aggregate they gave Trooper White ample justification for a brief detention to allay his concern.

## IV. Conclusion

Less than 45 minutes passed from the actual stop to the arrival of Officer Hill and Seltic. Approximately 10 minutes passed between the completion of the DSA-10 form for Mr. Walker and the K-9 team's arrival. Reasonable suspicion existed for the entire stop, given the inconsistent stories and other oddities surrounding the situation. Defendant Miller and Mr. Walker were unable to dispel this suspicion, and indeed seemed to dig themselves deeper all the time. Once Seltic had indicated the presence of narcotics, probable cause existed and the search

of the car was lawful. Therefore, the discovery of the heroin was also lawful, as were the arrests and the subsequent confession. Accordingly, the Defendant's Motion to Suppress Evidence is DENIED.

The Clerk of the Court is directed to send a certified copy of this Opinion and Order to the Defendant and all counsel of record.

ENTERED: /s/ Norman K. Moon
U.S. District Judge

October 11, 2006
Date